UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN  DIVISION
No. 7:11-CV-189-BR

JANICE C. KETTLE, GUY W.       )
HOLCOMB and MARILYN K.       )
HOLCOMB,                           )
                                 )
        Plaintiffs,        )
v.                              )        ORDER
                                 )
JOSEPH A. LEONARD,        )
                               )
        Defendant.      )

This matter is before the court on the 10 February 2012 motion for summary judgment filed by plaintiffs Janice C. Kettle, Guy W. Holcomb, and Marilyn K. Holcomb (collectively "plaintiffs") and on plaintiffs' 10 February 2012 motion to amend the complaint.  The motions are ripe for disposition.

## I.  BACKGROUND

Plaintiff Janice C. Kettle ("Kettle"), who is eighty-one years old, moved from Potomac, Maryland to Wilmington, North Carolina in January 2011.  (J. Kettle Aff., DE # 16, ¶¶ 1-2.) Plaintiffs Guy W. Holcomb and his wife Marilyn K. Holcomb (collectively "the Holcombs") live in Bolivia, North Carolina.  (G. Holcomb Aff., DE # 17, ¶ 1.)  Guy Holcomb is Kettle's son.  (Id. ¶ 8; J. Kettle Aff., DE # 16, ¶ 3.)

In approximately the spring or summer of 2009, the Holcombs were introduced to defendant Joseph A. Leonard ("Leonard") by their neighbors.  (G. Holcomb Aff., DE # 17, ¶ 3.) Leonard told the Holcombs that he had a great deal of experience providing financial advice and that they could trust him to take care of all of their investment needs.  (Id.)  Shortly thereafter, Leonard persuaded the Holcombs to invest $6,000 in a window washing business, Whistling

Window Washers, LLC.  (Id. ¶ 4; D. Mieden Aff., DE # 19, ¶¶ 3, 5 & Ex. B, DE # 19-2.)[1]

In November 2009, the Holcombs gave Leonard $50,000 for the purchase of shares in Proton Therapy, a company that was seeking to market cancer radiation therapy devices.  (G. Holcomb Aff., DE # 17, ¶ 5.)  In addition, Leonard convinced the Holcombs to invest the bulk of their savings, *i.e.* $400,000, in equity-backed annuities based on the representations that the annuities enjoyed good returns and full liquidity.  (Id. ¶ 6.)

Leonard also told the Holcombs in November 2009 that he had a special relationship with Woodlands Bank and that, as a result, he could place some of their money in a group certificate of deposit ("CD") account earning 4.05% interest.  (Id. ¶ 7.)  Based on these representations, on 20 November 2009, the Holcombs gave Leonard a check for $100,000 payable to Leonard Capital Management ("LCM"), a company owned by Leonard.  (Id. & Ex. A, DE # 17-1; J. Leonard Dep., DE # 22, at 30:1-9.)  The memo line on the check reflects the Holcombs' understanding that their money would earn a fixed rate of interest of 4.05%.  (G. Holcomb Aff., DE # 17, ¶ 7 & Ex. A, DE # 17-1.)

In late 2009 or early 2010, the Holcombs introduced Leonard to Kettle, who was residing in Maryland at the time.  (J. Kettle Aff., DE # 16, ¶ 3.)  After their introduction, Leonard traveled to Maryland to meet with Kettle to discuss the investment of her money, which was primarily held in cash, money market accounts, and CDs.  (Id.)  Prior to making the trip to Maryland, Leonard sent Kettle a letter stating: "[I] have a short term product that you can move your CD money to that will provide a 4.05% rate for one year only."  (Id. ¶ 6 & Ex. C, DE # 16-3.)  The

---

[1] Whistling Window Washers, LLC eventually ceased operations in 2011.  (D. Mieden Aff., DE # 19, ¶¶ 3, 6.)  Leonard has not returned the $6,000 that the Holcombs invested in this business.  (G. Holcomb Aff., DE # 17, ¶ 4.)

2

letter went on to state that this product was "insured through normal FDIC rules and regulations through the bank that is holding the money." (Id.)

When Leonard met with Kettle, he talked at length about his experience in the investment field and said that Kettle could trust him to get a higher rate of return on all of her investments. (J. Kettle Aff., DE # 16, ¶ 3.) He recommended that she take $400,000 that she had in a CD and invest that money in a CD or fixed-income investment with him. (Id. ¶ 6.) Leonard said that because of his relationship with the bank, he could get a interest rate of 4.05%, which would be better than her current rate of interest on her investments. (Id.) Leonard also recommended that Kettle invest some of her money in equity-indexed annuities. He told Kettle that she could get a superior rate of return through these annuities and that she would have access to the money at any time, just as she had with her current investments. (Id. ¶ 4.)

Based on Leonard's representations, on 19 March 2010,[2] Kettle gave Leonard a $400,000 check made payable to LCM for what she understood to be a CD investment. (Id. ¶ 7 & Ex. D, DE # 16-4.) Also based on Leonard's representations, Kettle placed approximately $453,000 in an annuity with EquiTrust Life Insurance Company and over $567,000 into two annuities with ING. (Id. ¶ 4.)

Leonard subsequently sent Kettle a letter in which he said that "[a]ll of what I do for clients is Safe, Safe, Safe." (Id. ¶ 7 & Ex. E, DE # 16-5.) He added that her "LCM fixed rate account" was "insured under normal FDIC programs" and had "personal guarantees" on it. (Id.) The letter closed by stating: "You have my promise that I will personally handle everything for

---

[2] The court notes that Kettle states in her affidavit that she gave Leonard the $400,000 check on 19 March 2009. (J. Kettle Aff., DE # 16, ¶ 7.) However, the 2009 date is clearly an error, as evidenced by the chronology of events listed in the affidavit and by the check itself. (Id., Ex. D, DE # 16-4.)

3

you. You have put your trust in me and I will not let you down. You will be able to enjoy your retirement and have 'fun in the sun' here in the great state of North Carolina." (J. Kettle Aff., Ex. E, DE # 16-5.)

Attached to this letter was an initial statement relating to the $400,000 that was allegedly being held for Kettle in the LCM fixed-rate account. (J. Kettle Aff., DE # 16, ¶ 7.) The document stated that "[a]ll monies are held with LCM Capital Management Group, LLC, at Woodlands Bank, Bank of America, Citizens Bank, First Bank and various other national and regional banking systems." (Id., Ex. F, DE # 16-6.) The statement described the money as being held in an "Account" with a designated "Account Number," and it identified Kettle's current and prospective account balances. (Id.) The following language was also included at the bottom of the document: "This is a fixed rate Promissory note for the period of one year recommended by LCM for additional terms [and] current rates that may apply." (Id.) Kettle later received another statement dated 1 November 2010 which showed the original $400,000 account balance and cumulative returns. (Id., Ex. G, DE # 16-7.)

In the winter of 2010, contrary to Leonard's prior representations, the Holcombs ascertained that they could not get back the money that they had invested in the annuities recommended by Leonard without paying a penalty. (G. Holcomb Aff., DE # 17, ¶ 6; M. Fitzhugh Aff., DE # 18, ¶¶ 9-10.) They also discovered that the amount of the investment return on the annuities was capped. (Id.) One of the annuity companies has refunded the Holcombs' investment on the basis that Leonard had not been authorized to sell the annuity, and negotiations are ongoing regarding the return of the other annuity. (G. Holcomb Aff., DE # 17, ¶ 6.)

4

In addition, the Holcombs learned that a federal criminal investigation was being conducted with respect to Leonard's involvement in the sale of Proton Therapy stock. (<u>Id.</u> ¶ 5; J. Leonard Dep., Ex. 23, DE # 22-22.) The Holcombs found out that the Proton Therapy stock certificate that Leonard gave them was a phony certificate that Leonard had prepared himself. (<u>Id.</u>) Proton Therapy eventually rectified the situation with the Holcombs. (<u>Id.</u>)

In January 2011, after the Holcombs learned of Leonard's problems surrounding the sale of Proton Therapy stock, they requested the immediate withdrawal of the $100,000 that they believed had been invested in a CD. (G. Holcomb Aff., DE # 17, ¶ 8 & Ex. B, DE # 17-2.) On 2 February 2011, Leonard responded by email and stated that he had received the request to "liquidate your funds with LCM." (<u>Id.</u>, Ex. C, DE # 17-3; <u>see also</u> J. Leonard Dep., DE # 22, at 39:1-19.) On 17 February 2011, Leonard's attorney emailed the Holcombs and stated that Leonard was "working diligently to obtain funds in order to liquidate your investment." (G. Holcomb Aff., DE # 17, ¶ 8 & Ex. E, DE # 17-5; <u>see also</u> <u>id.</u>, Ex. D, DE # 17-4.) Despite the Holcombs' demands for repayment, Leonard has not returned their $100,000. (G. Holcomb Aff., DE # 17, ¶ 8.)

Similarly, Kettle demanded the immediate return of her $400,000. (J. Kettle Aff., DE # 16, ¶ 8.) On 2 February 2011, Leonard responded by email with a promise to process the request as soon as possible and also expressing regret that the withdrawal request was made before the "anniversary date." (<u>Id.</u>, Ex. H, DE # 16-8.) A follow-up email from Leonard's attorney promised that Leonard was "working diligently to obtain funds in order to liquidate your investment." (<u>Id.</u>, Ex. I, DE # 16-9; <u>see also</u> <u>id.</u>, Ex. J, DE # 16-10.) Despite Kettle's demands for repayment, Leonard has not returned her $400,000. (J. Kettle Aff., DE # 16, ¶ 9.)

Sometime in 2011, Kettle also learned that her rates of return on the Equitrust and ING annuities were not what Leonard had represented, and she discovered that the money was not immediately available.  (Id. ¶ 5.)  Both annuity companies have agreed to cancel the annuities and return Kettle's money to her in full.  (Id.)

Plaintiffs commenced this action on 9 September 2011.  They have brought several claims against Leonard relating to the false representations that he allegedly made regarding the investment of Kettle's $400,000 and the Holcombs' $100,000 in a CD or other comparable fixed-rate secure instrument and relating to his failure to return their money upon demand.  On 10 February 2012, plaintiffs filed a motion for summary judgment.  (DE # 14.)  Leonard filed a response on 2 April 2012 (DE # 28), and plaintiffs filed a reply on 4 April 2012 (DE # 29).

In his memorandum in opposition to plaintiffs' motion for summary judgment, Leonard does not dispute any of the facts set forth by plaintiffs relating to the annuities purchased by plaintiffs, the Proton Therapy stock sold to the Holcombs, or the Holcombs' investment in the window washing business.  However, Leonard does dispute the circumstances surrounding Kettle's alleged $400,000 investment and the Holcombs' alleged $100,000 investment in a CD or other fixed-rate account.  He claims that plaintiffs loaned the money in question to him for an initial period of one year and that he never promised that their money would be invested in a CD or in any other secure instrument.  (See, e.g., Def.'s Mem. Opp'n Pls.' Mot. Summ. J., DE # 28, at 3, 6-8.)  Leonard maintains that the transactions with plaintiffs "were presented as promissory notes from the beginning . . . ."  (Id. at 6.)

Plaintiffs also filed a motion for leave to amend their complaint (DE # 24) on the same day that they filed their motion for summary judgment, i.e., 10 February 2012.  Leonard did not

file a response.

## II. DISCUSSION

A.    Motion to Amend Complaint

At the outset, the court considers plaintiffs' motion to amend their complaint.  Plaintiffs

filed their motion to amend on 10 February 2012.  (DE # 24.)  The memorandum in support of

the motion asserts that "[t]he deadline for amending the pleadings is February 15, 2012."  (Mem.

Supp. Mot. Am. Compl., DE # 25, at 1.)  However, according to the scheduling order entered in

this case, plaintiffs' deadline for amending the pleadings was actually 1 February 2012.  (Disc.

Plan, DE # 10, ¶ 5(c); Sch. Order, DE # 11.)  It appears that plaintiffs failed to differentiate

between their amendment deadline and Leonard's deadline for amending pleadings or joining

parties, which was 15 February 2012.  (Disc. Plan, DE # 10, ¶ 5(d).)  Thus, although plaintiffs'

motion to amend the complaint is written as if it was timely filed, it was, in fact, filed nine days

late.

When a party moves to amend a pleading after the scheduled time for amendments has

passed, the party must first establish "good cause" under Federal Rule of Civil Procedure 16 and

then establish the traditional requirements under Rule 15, *i.e.*, the absence of prejudice, futility,

and bad faith.  Nourison Rug Corp. v. Parvizian, 535 F.3d 295, 298-99 (4th Cir. 2008).  "Rule

16(b)'s good cause standard focuses on the timeliness of the amendment and the reasons for its

tardy submission; the primary consideration is the diligence of the moving party."  Stonecrest

Partners, LLC v. Bank of Hampton Roads, 770 F. Supp. 2d 778, 784 (E.D.N.C. 2011) (citation

and internal quotation marks omitted).

Given their mistaken belief as to the timeliness of their motion, plaintiffs have provided

no reason for the delay in submission. However, it is evident to the court that plaintiffs simply confused their deadline for amending the pleadings with Leonard's deadline. There is nothing to indicate to the court that plaintiffs were not diligent in their efforts to meet the deadline established in the scheduling order. Leonard was not deposed in this case until 7 December 2011, and the motion to amend the complaint was filed just two months thereafter. Furthermore, Leonard has not filed a response to the motion to amend or otherwise addressed the timeliness of plaintiffs' motion. Under these circumstances, the court finds good cause pursuant to Rule 16 and proceeds to the merits of plaintiffs' motion to amend.

Federal Rule of Civil Procedure 15(a)(2) instructs that a court "should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). "This liberal rule gives effect to the federal policy in favor of resolving cases on their merits instead of disposing of them on technicalities." Laber v. Harvey, 438 F.3d 404, 426 (4th Cir. 2006) (en banc). In this case, plaintiffs seek to amend the complaint to add claims for personal guaranty of debt and constructive fraud. (Mot. Am. Compl., DE # 24.) Plaintiffs maintain that "the proposed amendments are simply designed to bring the pleadings into conformity with acknowledgments which defendant made during the course of his deposition and to add a claim for constructive fraud in addition to the claim for regular fraud." (Mem. Supp. Mot. Am. Compl., DE # 25, at 2.)

As previously mentioned, Leonard has not responded to plaintiffs' motion. Upon review of the motion and proposed amendments, the court finds no evidence of undue delay, bad faith or dilatory motive, or futility of the amendments, and granting leave to amend does not prejudice Leonard. See, e.g., Foman v. Davis, 371 U.S. 178, 182 (1962); Laber, 438 F.3d at 426. As a result, plaintiffs' motion to amend the complaint will be granted.

8

B.     Summary Judgment Standard

Summary judgment is proper only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]he substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In considering a motion for summary judgment, the court is required to draw all reasonable inferences in favor of the non-moving party and to view the facts in the light most favorable to the non-moving party.  Id. at 255.  The moving party has the burden to show an absence of evidence to support the non-moving party's case.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  The party opposing summary judgment must then demonstrate that a triable issue of fact exists; he may not rest upon mere allegations or denials.  Anderson, 477 U.S. at 248. A mere scintilla of evidence supporting the case is insufficient.  Id. at 252.  Furthermore, evidence that is "merely colorable" or "not significantly probative" will not suffice to defeat a motion for summary judgment.  Id. at 249.  Rather, if the adverse party fails to bring forth facts showing that "reasonable minds could differ" on a material point, then disposition by summary judgment is appropriate.  Id. at 250; see also Teamsters Joint Council No. 83 v. Centra, Inc., 947 F.2d 115, 119 (4th Cir. 1991).

C.     Conversion Claims

The court first considers plaintiffs' conversion claims.  Under North Carolina law, conversion requires proof of "(1) the unauthorized assumption and exercise of the right of ownership; (2) over the goods or personal property; (3) of another; (4) to the exclusion of the

9

rights of the true owner." Estate of Graham v. Morrison, 607 S.E.2d 295, 302 (N.C. Ct. App.

2005) (citation and internal quotation marks omitted). The essence of the tort is a wrongful

deprivation of the property from the owner. Lake Mary Ltd. P'ship v. Johnston, 551 S.E.2d 546,

552 (N.C. Ct. App.), disc. review denied, 557 S.E.2d 538 (N.C. 2001).

Here, Leonard has failed to address the arguments presented by plaintiffs and therefore

appears to concede that summary judgment is appropriate on the conversion claims.[3]  See, e.g.,

Bayer Schering Pharma AG v. Watson Pharms., Inc., Nos. 2:07-CV-01472-KJD-GWF,

2:08-CV-00995-KJD-GWF, 2012 WL 1079574, at *7 (D. Nev. Mar. 30, 2012) (failure to oppose

movant's argument in brief opposing motion for summary judgment implicitly concedes the

argument (citing S. Nev. Shell Dealers Ass'n v. Shell Oil Co., 725 F. Supp. 1104, 1109 (D. Nev.

1989)); Klugel v. Small, 519 F. Supp. 2d 66, 72 (D.D.C. 2007) ("[W]hen a party does not

address arguments raised by a movant, the court may treat those arguments as conceded.").  The

court finds that, even under Leonard's version of events, it is evident from the record that

Leonard converted plaintiffs' funds when he failed to return them upon demand, thereby

willfully interfering with plaintiffs' possession of the funds.  Furthermore, there is no evidence in

the record which indicates that Leonard has any enforceable interest that would allow him to

retain the money.  Thus, the court will grant summary judgment to plaintiffs on the conversion

claims.[4]

---

[3] Leonard's memorandum in opposition to plaintiffs' motion for summary judgment contains only two sections of argument, which are entitled: "Conflicting affidavit and deposition testimony bars summary judgment as to fraud" and "Unfair and deceptive trade practices not shown by mere evidence of mere conversion[.]"  (Def.'s Mem. Opp'n Pls.' Mot. Summ. J., DE # 28, at 5, 6.)  The title of the latter section further demonstrates Leonard's apparent concession that plaintiffs are entitled to summary judgment on their conversion claims.

[4] Because of this conclusion, the court will not consider plaintiffs' alternate claims that Leonard has acknowledged personal responsibility for the debt.  (See Mot. Am. Compl., DE # 24, ¶¶ 30-33.)

D.     Fraud Claims

The court now turns to plaintiffs' claims for fraud.  The essential elements of actionable fraud are: (1) false representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party.  Rowan Cnty. Bd. of Educ. v. U.S. Gypsum Co., 418 S.E.2d 648, 658 (N.C. 1992); Ragsdale v. Kennedy, 209 S.E.2d 494, 500 (N.C. 1974).

Plaintiffs' claims of actual fraud are based on their allegations that Leonard falsely represented that he would place their money "in a secure, fixed income investment which would secure a high rate of interest."  (Compl., DE # 1, ¶¶ 12, 24.)  Both Kettle and the Holcombs have alleged that Leonard specifically told them that he had "a special relationship" with Woodlands Bank and that, as a result of this relationship, he could place plaintiffs' funds in a CD account that would earn 4.05% interest.  (G. Holcomb Aff., DE # 17, ¶ 7; see also J. Kettle Aff., DE # 16, ¶ 6.)  Based on these representations, Kettle gave Leonard $400,000, and the Holcombs gave him $100,000, to invest as he had promised.  (J. Kettle Aff., DE # 16, ¶ 7; G. Holcomb Aff., DE # 17, ¶ 7.)  Plaintiffs further assert that Leonard did not invest their money as he had promised but instead used it to pay for his personal expenses and other items.  (J. Kettle Aff., DE # 16, ¶ 11; G. Holcomb Aff., DE # 17, ¶ 9.)  Plaintiffs contend that Leonard deceived them into giving him their money for what they thought was a safe investment and that they were injured as a result because their funds have not been returned to them.  (J. Kettle Aff., DE # 16, ¶¶ 9, 12; G. Holcomb Aff., DE # 17, ¶¶ 8, 11.)

In response, Leonard challenges only the first and third elements of plaintiffs' claims.  (See, e.g., Def.'s Mem. Opp'n Pls.' Mot. Summ. J., DE # 28, at 7 ("[T]here are genuine issues of

material fact as to what defendant Leonard told the plaintiffs when he obtained their funds and what he intended to do with the funds at the time he acquired them . . . .").)  With respect to the first element of plaintiffs' claims, Leonard argues that he did not make any false representations to plaintiffs.  He maintains that he never told Kettle or the Holcombs that he would keep their money in a CD or in any other secure investment with a fixed interest rate, and he insists that plaintiffs loaned their money to him.

Specifically, Leonard contends that the transactions with plaintiffs "were presented as promissory notes from the beginning . . . ."  (Id. at 6.)  During his deposition, Leonard recited the phrase "promissory note" over and over again in an apparent attempt to avoid providing any details about the circumstances surrounding the purported loans from the plaintiffs.  (J. Leonard Dep., DE # 22, at 29:18; 30:5; 31:22-23; 40:24; 41:18; 42:2; 45:5; 60:10; 63:20; 63:23; 64:3; 69:1; 73:11).  However, Leonard cannot create a genuine dispute of material fact simply by incanting the words "promissory note."  Rather, it remains incumbent upon the party opposing summary judgment to establish a specific factual predicate from which it can be determined as a matter of law that a genuine dispute of material fact exists.  See Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (on a motion for summary judgment, the nonmoving party "must come forward with specific facts showing that there is a genuine issue for trial" (emphasis in original) (citation and internal quotation marks omitted)).

With respect to Kettle, no such factual predicate exists.  A "promissory note" is defined as "[a]n unconditional written promise, signed by the maker, to pay absolutely and in any event a certain sum of money either to, or to the order of, the bearer or a designated person."  Black's Law Dictionary 1162 (9th ed. 2009).  In this case, Leonard has not produced a written, signed

12

promissory note to support his contention that the $400,000 transaction with Kettle was a loan. More importantly, when Leonard was asked during his deposition if he had ever prepared and presented a promissory note to Kettle, he answered "No." (J. Leonard Dep., DE # 22, at 45:16.) Other than Leonard's deposition testimony, the only evidence that relates to a promissory note in any way are the account statements that were provided to Kettle by Leonard. (J. Kettle Aff., Exs. F-G, DE ## 16-6, 16-7; see also J. Leonard Dep., Ex. 18, DE # 22-17.) The documents contain a printed notation at the bottom which states: "This is a fixed rate Promissory note for the period of one year renewable by LCM for additional terms [and] current rates that may apply." (J. Kettle Aff., Ex. F, DE # 16-6; see also id., Ex. G, DE # 16-7.) These unsigned statements are plainly insufficient to demonstrate the existence of a promissory note, especially when Leonard has admitted that Kettle was never presented with such a note.[5] Thus, Leonard has failed to produce significantly probative evidence to refute Kettle's version of events with regard to the false representations that were made to her in this case.

Next, the court examines Leonard's contention that he did not make any false representations to the Holcombs. Unlike the situation with Kettle, Leonard testified in his deposition that he presented Guy Holcomb with a promissory note at the time the Holcombs gave him their money.[6] (J. Leonard Dep., DE # 22, at 31:24-32:1.) Leonard also testified that

---

[5] Moreover, the account statements, when viewed as a whole, strongly support Kettle's contention that Leonard told her that her money would be placed in a secure investment with a fixed rate of interest. For example, both documents indicated that "[a]ll monies are held with LCM Capital Management Group, LLC, at Woodlands Bank, Bank of America, Citizens Bank, First Bank and various other national and regional banking systems." (J. Kettle Aff., Ex. F, DE # 16-6; see also id., Ex. G, DE # 16-7.) The account statements also described the money as being held in an "Account" with a designated "Account Number," and they identified Kettle's current and prospective account balances. (Id.)

[6] The Holcombs have denied that Leonard gave them a promissory note. (G. Holcomb Aff., DE # 17, ¶¶ 7, 10.)

13

the promissory note provided a 4.05% rate of return and that it had an initial term of one year that could be renewed for additional one-year periods. (Id. at 42:2-6.)

However, the documentary evidence regarding this alleged promissory note is nonexistent. Leonard admitted during his deposition that he did not have a copy of the promissory note that he claims to have given to the Holcombs (id. at 32:2-3; 41:19-23), and he has failed to produce the note in response to plaintiffs' request for documents. (See M. Murchison Aff., Ex. 1, DE # 23-1, at 5 ¶ 3.) Leonard has also not attempted to explain any efforts that may have been made to locate the promissory note. Thus, he has essentially conceded that no such document exists.

Furthermore, although Leonard argues that there is a genuine dispute of material fact "as to what defendant . . . told [the Holcombs] when he obtained their funds" (Def.'s Mem. Opp'n Pls.' Mot. Summ. J., DE # 28, at 7), his deposition testimony is devoid of specifics regarding this issue. In addition, he has produced no affidavits or other documentary evidence to demonstrate what he said to the Holcombs about the transaction. It is significant that Leonard has not provided any details regarding the discussions that he had with the Holcombs leading up to the conveyance of the $100,000 at issue.

Leonard maintains that he made "no promise of keeping the funds in a CD or using them for any other purpose, only promising to repay the promissory note[] with the promised interest." (Id. at 6 (emphasis added).) In making this argument, Leonard would have the trier of fact believe that the Holcombs gave him their money in a proverbial vacuum. However, this is a ludicrous theory, one that no rational trier of fact would subscribe to. It is utterly implausible that the Holcombs would give Leonard $100,000 without discussing the reasons why Leonard

14

wanted the money or the specific ways in which he would use the funds.[7] This is especially true given the fact that Leonard has not denied that he acted as a financial advisor to the Holcombs or that he had specific discussions with them regarding their investments in annuities and Proton Therapy stock. Therefore, given the almost total lack of specificity surrounding the purported loan from the Holcombs, the court finds that the evidence presented by Leonard is simply too sparse to create a genuine dispute of material fact regarding this issue. Similar to the situation with Kettle, Leonard has failed to produce significantly probative evidence to refute the Holcombs' version of events with respect to the first element of their fraud claim.

Leonard also asserts that there is a genuine dispute of material fact regarding the third element of plaintiffs' fraud claims, *i.e.*, whether he intended to deceive plaintiffs at the time he made the representations that are at issue in this case. Although Leonard did not testify during his deposition as to his intentions at the precise time that he made the representations, he did testify that after he obtained plaintiffs' money, he invested it in other businesses, including Whistling Window Washers, LLC, a car detailing business, two coffee shops, and a bar. (J. Leonard Dep., DE # 22, at 32:9-25; 36:4-5; 45:17-46:3; 73:18-23.) He also testified that he believed these investments were safe at the time he made them and that they would generate returns. (Id. at 49:20-23; 77:23-78:2; 81:1-13; see also Def.'s Mem. Opp'n Pls.' Mot. Summ. J., DE # 28, at 4.) Leonard argues that this testimony regarding his investment of the money demonstrates that he did not intend to deceive plaintiffs, or that, at a minimum, it creates a genuine dispute of material fact as to his intent.

---

[7] The court notes that a similar line of reasoning can be applied to the $400,000 transaction between Kettle and Leonard.

The court recognizes that "[s]ummary judgment is generally inappropriate in an action alleging fraud, as the existence of fraud must include fraudulent intent which is usually proven by circumstantial evidence." Sunset Beach Dev., LLC v. AMEC, Inc., 675 S.E.2d 46, 52 (N.C. Ct. App. 2009) (alteration in original) (citation and internal quotation marks omitted); Lewis v. Blackman, 448 S.E.2d 133, 136 (N.C. Ct. App. 1994). Nevertheless, as with the first element of plaintiffs' fraud claims, it remains incumbent upon Leonard to come forward with specific facts showing that there is a genuine issue for trial. Here, Leonard has failed to carry his burden.

In arguing that there is a genuine dispute of material fact regarding the existence of fraudulent intent, Leonard has ignored other testimony that he provided during his deposition. Leonard testified that he invested $300,000 of plaintiffs' money in the Darling House bar owned by Steve Pattison (J. Leonard Dep., DE # 22, at 46:12-25), approximately $250,000 in coffee shops owned by Cheryl Hasbold (id. at 73:24-74-1; 76:16-17), and $20,000 to $30,000 in Whistling Window Washers, LLC (id. at 33:10-13).[8] He also explicitly testified that his bank records would substantiate his claim that he had invested all of plaintiffs' money in other businesses. (Id. at 36:9-19; 48:7-18.) However, plaintiffs have submitted Leonard's relevant bank records, accounting records, and summaries of the deposits, withdrawals, and other disbursements made from his bank accounts as part of their motion for summary judgment, and they maintain that these documents completely refute Leonard's testimony regarding what he intended to do with their funds. (See M. Fitzhugh Aff., DE # 18, & Ex. A; D. Mieden Aff., DE #

_____

[8] The court acknowledges that these figures add up to more than the $500,000 that plaintiffs collectively gave to Leonard. Regardless, Leonard has indicated that he invested all of plaintiffs' money in other businesses. (See, e.g., J. Leonard Dep., DE # 22, at 32:9-25; 48:7-18; see also Def.'s Mem. Opp'n Pls.' Mot. Summ. J., DE # 28, at 3-4.) The court also notes that Leonard testified that he was unsure about whether he made a separate investment in the car detailing business, which had the same principals as the window washing business. (J. Leonard Dep., DE # 22, at 33:10-34:6.)

19, & Exs. A-G; M. Murchison Aff., County Bank records, DE # 20, & Exs. 1-7; M. Murchison

Aff., Woodlands Bank records, DE # 21, & Exs. 1-9.)  The reliability of the bank records and

accounting records is not contested, as the court has seen no evidence to contradict or otherwise

call into question the authenticity of these documents.

The records submitted by plaintiffs conclusively show that, at most, only a small portion

of plaintiffs' money was given to the businesses described by Leonard in his deposition.[9]  It is

apparent from the bank records that the vast majority of plaintiffs' money was used to pay for

Leonard's personal expenses, such as personal credit card payments, and for other expenses that

were unrelated to the investments set forth in Leonard's deposition.  (See, e.g., Pls.' Mem. Supp.

Mot. Summ. J., DE # 15, at 5, 7-8; M. Fitzhugh Aff., DE # 18, ¶¶ 14-15, & Ex. A, DE # 18-1; M.

Murchison Aff., Woodlands Bank records, Ex. 1, DE # 21-1; id., Ex. 2, DE # 21-2, at 1, 4.)

The records in this case expressly show that the largest inappropriate expenditure made

by Leonard following the deposit of the Holcombs' money into LCM's Woodlands Bank

account on 20 November 2009 involved a transfer in December 2009 of $61,571.28, in two

installments, to a money market account maintained by Leonard individually at Woodlands

---

[9] Specifically, Leonard gave a total of $6500 to the coffee shop businesses between 17 December 2009 and 12 March 2010.  (M. Murchison Aff., Woodlands Bank records, Ex. 5, DE # 21-5, at 9, 28.)  This money could only have come from the Holcombs and not from Kettle because Kettle had not yet given her money to Leonard during this time period.  See note 10, infra.

On 16 April 2010, Leonard also gave $15,000 to the coffee shop businesses and $25,000 to Steve Pattison, the owner of the Darling House bar.  (M. Murchison Aff., County Bank records, Ex. 1, DE # 20-1, at 1-2; id., Ex. 2, DE # 20-2, at 1-2; id., Ex. 3, DE # 20-3, at 2.)  This money could only have come from Kettle and not from the Holcombs because the Holcombs' money had already been dispersed by 16 April 2010.  See note 10, infra.

Furthermore, Leonard loaned $21,000 to Whistling Window Washers, LLC between 22 February 2010 and 19 October 2010.  (D. Mieden Aff., DE # 19, ¶ 10; id., Ex. G, DE # 19-7.)  In addition, he made several small payments to two employees of the business, Carl Leonard and Todd Lawrence (see, e.g., D. Mieden Aff., DE # 19, ¶ 9; M. Murchison Aff., Woodlands Bank records, Ex. 1, DE # 21-1; id., Ex. 3, DE # 21-3, at 5-6, 9-10; id., Ex. 5, DE # 21-5, at 32-33), which could arguably be considered as investments in the business.  Thus, viewing the records in the light most favorable to Leonard, he gave approximately $70,000 of plaintiffs' collective $500,000 to the businesses he discussed in his deposition.

17

Bank. (M. Murchison Aff., Woodlands Bank records, DE # 21, ¶ 9; id., Ex. 1, DE # 21-1, at 5; id., Ex. 2, DE # 21-2, at 4; id., Ex. 4, DE # 21-4, at 1; id., Ex. 6, DE # 21-6, at 2; id., Ex. 7, DE # 21-7.)  In February 2011, the proceeds of this money market account, including the $61,571.28, were used to pay off a $400,000 personal loan that Leonard had obtained from Woodlands Bank in 2008.  (Id., Ex. 6, DE # 21-6, at 19; id., Ex. 8, DE # 21-8; id., Ex. 9, DE # 21-9, at 1, 9).

Similarly, following the deposit of Kettle's money into LCM's Woodlands Bank account on 22 March 2010, another inappropriate transfer of $117,500 was made on 31 March 2010 to a different LCM account and then to Leonard's personal account at County Bank where it was used to pay for certain expenses relating to Leonard's home near Greenville, South Carolina. (Id., Ex. 1, DE # 21-1, at 11; id., Ex. 2, DE # 21-2, at 13; M. Murchison Aff., County Bank records, DE # 20, ¶¶ 4, 8; id., Ex. 1, DE # 20-1, at 1; id., Ex. 2, DE # 20-2, at 1; id., Ex. 3, DE # 20-3, at 1; id., Ex. 5, DE # 20-5, at 1, 3, 7; id., Ex. 6, DE # 20-6, at 1; id., Ex. 7, DE # 21-7, at 1.)

Importantly, the records also show that plaintiffs' money was promptly spent by Leonard once it was deposited into the LCM account at Woodlands Bank.[10]  As plaintiffs have pointed out, "Leonard has not sought to challenge Plaintiffs' factual demonstration that both the Holcombs' $100,000 and Kettle's $400,000 were quickly spent by Leonard on personal expenses

---

[10] The bank records demonstrate that the LCM checking account at Woodlands Bank had a negative balance of $623.77 at the beginning of November 2009.  (M. Murchison Aff., Woodlands Bank records, Ex. 2, DE # 21-2, at 1.)  The Holcombs' $100,000 was deposited into this account on 20 November 2009.  (Id.; M. Murchison Aff., Woodlands Bank records, DE # 21, ¶ 4.)  The account balance at the end of December 2009 was $5,284.23. (M. Murchison Aff., Woodlands Bank records, Ex. 2, DE # 21-2, at 4.)  Therefore, the Holcombs' money had essentially been dispersed by the end of December 2009.
The LCM checking account balance at the beginning of March 2010 was $1,422.82.  (M. Murchison Aff., Woodlands Bank records, Ex. 2, DE # 21-2, at 12.)  Kettle's $400,000 was deposited into the account on 22 March 2010.  (Id.; M. Murchison Aff., Woodlands Bank records, DE # 21, ¶ 4.)  On 30 April 2010, the account balance was $22,836.84.  (M. Murchison Aff., Woodlands Bank records, Ex. 2, DE # 21-2, at 14.)  Thus, the vast majority of Kettle's money had been dispersed by the end of April 2010.  This documentary evidence refutes Leonard's testimony that Kettle's money remained in the LCM account for "[m]onths."  (J. Leonard Dep., DE # 22, at 51:6.)

18

and other things having nothing to do with Leonard Capital Management or any attempted investment."[11]  (Pls.' Reply Mot. Summ. J., DE # 29, at 1.)  This rapid disbursement of plaintiffs' funds rebuts Leonard's argument that he did not intend to defraud plaintiffs at the time that he acquired their money.  Thus, in light of the significant documentary evidence that has been submitted by plaintiffs in this case, Leonard's deposition testimony relating to his lack of fraudulent intent is a mere scintilla of evidence that does not present "a sufficient disagreement to require submission to a jury . . . ."[12]  Anderson, 477 U.S. at 251-52.

A factual dispute remains in this case, to be sure, but not a genuine one.  The court finds that there is no room for ordinary minds to differ as to the proper conclusion to be drawn from the evidence.  It would not be reasonable for a jury to conclude from the record that plaintiffs loaned their money to Leonard in exchange for promissory notes or that Leonard lacked fraudulent intent.  Because Leonard has not challenged any of the other elements of plaintiffs' actual fraud claims and because the court is convinced that the uncontraverted evidence supports plaintiffs' contentions, plaintiffs' motion for summary judgment will be granted with respect to these claims.

Moreover, even if plaintiffs were not entitled to summary judgment on their claims of

---

[11] The court notes that Leonard testified during his deposition that he was "not sure" whether he used any of plaintiffs' funds for personal expenses and that he "would have to look at the [bank] statements" to determine whether he had personally spent any of plaintiffs' money.  (J. Leonard Dep., DE # 22, at 87:3-4.)  Furthermore, Leonard admitted during his deposition that he never told Kettle that he was going to invest the money in other businesses.  (Id. at 51:24-52:2.)

[12] To the extent that Leonard argues that his intention at the time he made the representations to plaintiffs was to simply "borrow" their funds as opposed to investing them (see Def.'s Mem. Opp'n Pls.' Mot. Summ. J., DE # 28, at 8), the court again finds that there is a complete lack of evidence to support this theory.  As previously discussed, Leonard has failed to produce any documentary evidence to show that he received generic loans from plaintiffs, and it is simply beyond belief that plaintiffs would give Leonard their money without discussing the reasons why he wanted the money or the specific ways in which he would use the funds.  See discussion, supra, at 14-15.

actual fraud, they would still be entitled to summary judgment on their alternate claims of constructive fraud. (See Mot. Am. Compl., DE # 24, ¶¶ 34-39; Pls.' Mem. Supp. Mot. Summ. J., DE # 15, at 15.) "Constructive fraud arises where a confidential or fiduciary relationship exists, and its proof is less 'exacting' than that required for actual fraud." Cash v. State Farm Mut. Auto. Ins. Co., 528 S.E.2d 372, 380 (N.C. Ct. App.) (citation omitted), aff'd, 538 S.E.2d 569 (N.C. 2000) (per curiam); see also Watts v. Cumberland Cnty. Hosp. Sys., Inc., 343 S.E.2d 879, 884 (N.C. 1986). To succeed on a claim for constructive fraud, a plaintiff must show (1) a relationship of trust and confidence akin to that of a fiduciary, (2) that the defendant took advantage of that position of trust in order to benefit himself, and (3) that the plaintiff was injured as a result. Barger v. McCoy Hillard & Parks, 488 S.E.2d 215, 224 (N.C. 1997); Sterner v. Penn, 583 S.E.2d 670, 674 (N.C. Ct. App. 2003). Constructive fraud differs from actual fraud in that "it is based on a confidential relationship rather than a specific misrepresentation." Terry v. Terry, 273 S.E.2d 674, 678-79 (N.C. 1981). Furthermore, intent to deceive is not an essential element of a constructive fraud claim. Link v. Link, 179 S.E.2d 697, 704 (N.C. 1971).

Although the North Carolina courts do not appear to have addressed the issue of whether a financial advisor owes a fiduciary duty to a customer, courts in other jurisdictions have acknowledged the fiduciary nature of such a relationship. See, e.g., McGraw v. Wachovia Secs., L.L.C., 756 F. Supp. 2d 1053, 1078 (N.D. Iowa 2010) (noting that "a fiduciary duty exists between a broker or financial advisor and a customer or other individual if the individual entrusts the broker/advisor to select and manage his or her investments"); Levinson v. PSCC Servs., Inc., No. 3:09-CV-00269 (PCD), 2010 WL 5477250, at *14 (D. Conn. Dec. 29, 2010) ("[C]ustodial and financial advisor roles by their very nature require a unique degree of confidence and trust

20

between the parties because they involve giving financial advice and investing the other party's assets."); <u>Johnston v. CIGNA Corp.</u>, 916 P.2d 643, 647 (Colo. Ct. App. 1996) ("Financial planners . . . owe a fiduciary duty to their customers."). Here, Leonard does not deny plaintiffs' contentions that he held himself out to be a financial advisor or that he invited plaintiffs to place their trust and confidence in him. (<u>See</u>, <u>e.g.</u>, J. Kettle Aff., Ex. E, DE # 16-5.) Leonard told Kettle and the Holcombs that he had significant experience in the investment field. (J. Kettle Aff., DE # 16, ¶ 3; G. Holcomb Aff., DE # 17, ¶ 3.) He also developed a relationship with plaintiffs that went beyond the transactions that are the subject of this lawsuit. He convinced the Holcombs to invest in Proton Therapy stock and in Whistling Window Washers, LLC, and he convinced both Kettle and the Holcombs to invest in annuities that he recommended. (J. Kettle Aff., DE # 16, ¶ 4; G. Holcomb Aff., DE # 17, ¶¶ 4-6.) Accordingly, the court finds that plaintiffs have satisfied the first element of their constructive fraud claims.

Furthermore, it is clear that Leonard took advantage of his relationship with plaintiffs for his own benefit. As previously discussed in relation to plaintiffs' claims for actual fraud, <u>see discussion</u>, <u>supra</u>, at 17-18, the record evidence shows that regardless of what his intention was at the time he obtained the money, Leonard misappropriated a large portion of plaintiffs' funds for his own use. Leonard has produced no evidence to counter the evidence submitted by plaintiffs with regard to this issue. Finally, there is no doubt that plaintiffs have been injured, as their money has not been returned, nor have they received any interest as promised. As a result, the court finds that plaintiffs are entitled to summary judgment on their alternate claims for constructive fraud.[13]

---

[13] As was the case with plaintiffs' conversion claims, Leonard has failed to address the constructive fraud claims in his memorandum in opposition to the motion for summary judgment.

E.    Unfair and Deceptive Trade Practice Claims

Plaintiffs have also asserted claims against Leonard for unfair and deceptive trade practices.  In order to establish a claim under the Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat. § 75-1.1 *et seq*., a plaintiff must show that "(1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." Dalton v. Camp, 548 S.E.2d 704, 711 (N.C. 2001).  Leonard does not dispute that the second and third elements are met (see Def.'s Mem. Opp'n Pls.' Mot. Summ. J., DE # 28, at 7-8); thus, the issue before the court is whether Leonard committed an unfair or deceptive act or practice.

"A practice is unfair if it is unethical or unscrupulous, and it is deceptive if it has a tendency to deceive." Dalton, 548 S.E.2d at 711.  "Moreover, '[s]ome type of egregious or aggravating circumstances must be alleged and proved before the [Act's] provisions may [take effect].'" Id. (alterations in original and emphasis omitted) (quoting Allied Distribs., Inc. v. Latrobe Brewing Co., 847 F. Supp. 376, 379 (E.D.N.C. 1993)).

Here, plaintiffs' proof of fraud, either actual or constructive, is sufficient, in and of itself, to prove a violation of the UDTPA.  See, e.g., Jones v. Harrelson & Smith Contractors, LLC, 670 S.E.2d 242, 252 (N.C. Ct. App. 2008) ("[I]t is well-settled that a plaintiff who proves fraud thereby establishes that unfair or deceptive acts have occurred." (citation and internal quotation marks omitted)), aff'd, 677 S.E.2d 453 (N.C. 2009) (per curiam); Davis v. Sellers, 443 S.E.2d 879, 884 (N.C. Ct. App. 1994) (same), disc. review denied, 454 S.E.2d 248 (N.C. 1995); Rosenthal v. Perkins, 257 S.E.2d 63, 67 (N.C. Ct. App. 1979) ("'[P]roof of fraud would necessarily constitute a violation of the prohibition against unfair and deceptive acts . . . .'"

22

(quoting <u>Hardy v. Toler</u>, 218 S.E.2d 342, 346 (N.C. 1975)).  It is evident in this case that Leonard has engaged in a pattern of unfair and deceptive conduct and that he took advantage of plaintiffs for his own benefit.  For example, Leonard told Kettle that her money was "Safe, Safe, Safe" (J. Kettle Aff., Ex. E, DE # 16-5) and that it would be "insured through normal FDIC rules and regulations through the bank that is holding the money."  (<u>Id.</u>, Ex. C, DE # 16-3.)   He also provided Kettle with account statements which inaccurately conveyed the impression that her money had been placed in a bank account that was earning interest.  (<u>Id.</u>, Exs. F-G, DE ## 16-6, 16-7.)

In arguing that he is exempt from the provisions of the UDTPA, Leonard makes the same arguments that he did with respect to plaintiffs' actual fraud claims, *i.e.*, that there are genuine disputes of material fact regarding what he told plaintiffs and what he intended to do with their money.  However, as the court has already discussed in Section II.D., <u>supra</u>, Leonard has failed to produce significantly probative evidence to show that either Kettle or the Holcombs loaned him the money at issue.  Furthermore, Leonard's assertion that he invested all of plaintiffs' funds in other businesses has been clearly disproven by his bank records and other documentary evidence.  The court concludes that Leonard has failed to present evidence raising a genuine dispute of material fact on the issue of whether his conduct constituted an unfair or deceptive trade practice.  As a result, plaintiffs' motion for summary judgment will be granted with respect to these claims.

F.      <u>Damages</u>

Damage in a fraud case "is the amount of loss caused by the difference between what was

received and what was promised through a false representation."[14]  First Atl. Mgmt. Corp. v. Dunlea Realty Co., 507 S.E.2d 56, 65 (N.C. Ct. App. 1998); see also Collier v. Bryant, 719 S.E. 2d 70, 80 (N.C. Ct. App. 2011).  Here, Kettle is entitled to the return of her $400,000 investment, and the Holcombs are entitled to have their $100,000 investment returned.  The court also awards the Holcombs interest at the rate promised by Leonard, i.e., 4.05% per annum, from the date of their investment.  Similarly, Kettle will be awarded 4.05% interest per annum from the date of her investment.  As requested by plaintiffs, their compensatory damages will further be trebled pursuant to N.C. Gen. Stat. § 75-16.  (See Pls.' Mem. Supp. Mot. Summ. J., DE # 15, at 15.)

Plaintiffs also seek to recover reasonable attorney's fees under N.C. Gen. Stat. § 75.16.1. Such fees may be awarded where the court determines that "[t]he party charged with the violation has willfully engaged in the act or practice, and there was an unwarranted refusal by such party to fully resolve the matter which constitutes the basis of such suit . . . ."  N.C. Gen. Stat. § 75-16.1(1).  "An award or denial of attorney's fees under this section, even where supporting facts exist, is within the sound discretion of the trial court."  S. Bldg. Maint., Inc. v. Osborne, 489 S.E.2d 892, 897 (N.C. Ct. App. 1997).  Plaintiffs have "the burden to prove that [d]efendant['s] refusal to settle was unwarranted."  Llera v. Sec. Credit Sys., Inc., 93 F. Supp. 2d 674, 680 (W.D.N.C. 2000).

---

[14] Although the court has also ruled in favor of plaintiffs on their conversion and UDPTA claims, they are not entitled to receive separate damage awards on those claims.  It is apparent that the conduct which forms the basis for all of plaintiffs' claims is the same, and it is clear that they are not entitled to multiple, cumulative recoveries for a single injury.  See, e.g., Volumetrics Med. Imaging, Inc. v. ATL Ultrasound, Inc., No. 1:01CV182, 2003 WL 21650004, at *3 (M.D.N.C. July 10, 2003) ("Here, it is apparent that the conduct which forms the basis for both the fraud claim and the UDTPA claim is the same and it is well settled that a jury may not award multiple damage figures for the same conduct."); Smith v. Gulf Oil Corp., 79 S.E.2d 880, 885 (N.C. 1954) (It is forbidden "that one shall be twice vexed for one and the same cause.").

24

In this case, the court's finding that Leonard committed a fraud against plaintiffs implicitly indicates that Leonard's behavior was willful. However, there is no evidence in the record that would allow the court to make a determination that Leonard engaged in an unwarranted refusal to fully resolve plaintiffs' claims. Although Leonard has contested plaintiffs' actual fraud and UDTPA claims, he has assumed some responsibility in this matter by admitting that he is personally liable for repaying the sum of $400,000 to Kettle and $100,000 to the Holcombs. (See Def.'s Mem. Opp'n Pls.' Mot. Summ. J., DE # 28, at 2-3; J. Leonard Dep., DE # 22, at 51:13-15; 73:12-17.) This acknowledgment certainly does not amount to an unwarranted refusal to resolve plaintiffs' claims. As a result, the court declines plaintiffs' request for an award of attorney's fees.

### III. CONCLUSION

Based on the foregoing reasons, plaintiffs' motion to amend the complaint (DE # 24) is GRANTED. The complaint (DE # 1) is hereby deemed to include the allegations contained in paragraphs 30 through 39 of plaintiffs' motion to amend the complaint (DE # 24). Plaintiffs' motion for summary judgment (DE # 14) is also GRANTED.

It is ORDERED, ADJUDGED, and DECREED that:

(1) Kettle shall have and recover from Leonard the sum of $1,321,500;[15]

(2) the Holcombs shall have and recover from Leonard the sum of $334,384.50;[16] and

---

[15] This total award includes Kettle's initial $400,000 investment plus $40,500 in simple interest, which was calculated at 4.05% per annum from the date of Kettle's investment, 19 March 2010 through the date of the entry of this judgment, i.e., 2.5 years. The sum of $440,500 was then trebled pursuant to N.C. Gen. Stat. § 75-16.

[16] This total award includes the Holcombs' initial $100,000 investment plus $11,461.50 in simple interest, which was calculated at 4.05% per annum from the date of the Holcombs' investment, 20 November 2009 through the date of the entry of this judgment, i.e., 2.83 years. The sum of $111,461.50 was then trebled pursuant to N.C. Gen. Stat. § 75-16.

(3) postjudgment interest shall accrue at the federal legal rate on the sums set forth in paragraphs 1 and 2 above from the date of entry of this judgment until the judgment is satisfied.

The Clerk is DIRECTED to close this case.

This 17 September 2012.

_____
W. Earl Britt
Senior U.S. District Judge